STATE OF MAINE
KENNEBEC, SS

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV 15-79

AFSCME, COUNCIL 93,
        Plaintiff

v.                                          DECISION

PENOBSCOT COUNTY
SHERIFF'S OFFICE,
        Defendant

Before the court is AFSCME, Council 93's motion to vacate an arbitration award.

The Sheriff of Penobscot County found that Corporal William Gardner "belittled, demeaned and intimidated" correctional officers under his supervision. The Sheriff demoted Gardner, temporarily prohibited Gardner from bidding on assignments, and permanently revoked Gardner's law enforcement commission.

Gardner filed three grievances with the County Commissioners, which held hearings on the grievances on May 23, 2014, and June 17, 2014. The Commissioners denied the three grievances, so Gardner demanded arbitration.

On January 23, 2015, the Board of Arbitration and Conciliation (BAC) denied Gardner's grievance and concluded:

The County had just cause to demote the Grievant.

The County did not violate the Agreement by temporarily restricting the Grievant from bidding on open shift assignments in his new position.

The County did not violate the Agreement when it placed the Grievant on paid administrative leave in excess of 30 days without a report of the outcome.

The County did not violate the Agreement when the Sheriff revoked the Grievant's deputy commission.

The factual background is based on the facts found in BAC decision under the findings of fact.

Gardner was a corporal at the County Corrections Line Unit, who supervised about 15 corrections officers on his day shift at the jail. A union representative told Sheriff Glen Ross that there were concerns that Gardner created a hostile work environment. Although the Sheriff was willing to investigate the claims, the County Commissioners elected to have Rebekah Smith, a private attorney, investigate the allegations.

Smith investigated the allegations by interviewing Gardner, the complainants, and seventeen other collateral witnesses. In Smith's report, Smith found the complainants' testimony credible based on their demeanor and the corroborating statements of collateral witnesses. Smith concluded "the weight of the evidence supported the fact that the environment on Mr. Gardner's shift was perceived by many of his subordinates as hostile." The evidence indicated "that Mr. Gardner's supervisory approach, both in person and over the radio, relied upon belittling, humiliating and negative treatment, often directed at female subordinates, but also towards individuals he perceived as weak." Specifically, the three complainants—Corrections Officers Burgess, Pena, and Stupak—stated that Gardner belittled and demeaned them with sarcasm and negative comments.

When the County Commissioners reviewed Smith's report, they determined the matter should be referred to the Sheriff for action.

After the County Commissioners sent Smith's report to the Sheriff, a hearing was held on March 14, 2014, which was conducted by Captain Richard Clukey. As a result of the hearing, the Sheriff found that Gardner had "engaged in repeated conduct at work, including talking over the radio, in which [Gardner] belittled, demeaned and intimidated persons under [his] supervision." The Sheriff also found that Gardner's conduct had a negative effect on the working environment on Gardner's shift, and on a number of individuals under Gardner's supervision. The Sheriff demoted Gardner and prevented Gardner from being reassigned to shift he supervised for six months.

In the Sheriff's decision, the Sheriff did not consider Gardner's counseling and/or disciplinary action prior to 2009, but did consider the pre-2009 conduct to

put Gardner's recent conduct into context. Based on the Article 11 of the CBA, the Sheriff wrote in his letter to Gardner dated April 14, 2014:

> Based on this contract language, I agree that no documentation of counseling and/or disciplinary action prior to 2009 will be considered for discipline or progressive discipline purposes, even if it is retained in the compliance file. Any counseling and/or discipline prior to 2009 will not be considered. However, I find that the CBA does not prohibit consideration of prior conduct to help place current conduct in perspective, as long as counseling/disciplinary action, if any flowed from that prior conduct, is not considered. The prior conduct is relevant to the current matter because the complaint under investigation is a claim of hostile work environment, which, by its very nature, involves a single continuous pattern which includes a series of occurrences over time. The courts view a hostile work environment claim in this manner. Accordingly, I find that pre-2009 conduct is relevant and may be considered for the limited purpose of placing more recent events in context.

The BAC evaluated four issues, but two are relevant to the case before this Court:

1. Whether the Grievant was demoted without just cause in violation of the Corrections Supervisory Unit contract.

2. Whether the County violated the Corrections Supervisory Unit contract by temporarily restricting the Grievant from bidding on open shift assignments in his new position as part of the demotion.

The BAC noted that the Sheriff considered various options to discipline Gardner based on Gardner's previous evaluations:

> He believed this required more than minor discipline. The Sheriff had spoken with Mr. Gardner several times in the past about the need to reduce sarcasm in communications with many employees and change his workplace demeanor. On reviewing Mr. Gardner's evaluations, the Sheriff saw that, for example, the 2007-08 evaluation said that Mr. Gardner needed to avoid "rude and degrading communications," and the 2008-09 evaluation said Mr. Gardner "can be sarcastic and unprofessional, making snide remarks to staff." The record showed

that Mr. Gardner's conduct would improve temporarily after counseled or receiving unfavorable evaluations in this area, but he would then resort back to his prior behavior. Because of the widespread and ongoing nature of Mr. Gardner's conduct in his supervisory capacity, the Sheriff chose demotion with a final warning as the appropriate discipline because this would remove Mr. Gardner from a position of authority, but with proper remedial training, the Sheriff believed Mr. Gardner could use his skills to be an effective CO. The Sheriff further directed Mr. Gardner to participate in a program of remedial training within six months, during which period he would not be reassigned to the same shift on which he worked as a supervisor.

The BAC noted that the central issue in the case is whether the County had just cause to demote Gardner. The BAC noted "just cause" is undefined:

Although there is no set definition for "just cause," this standard requires an employer to do what a reasonable person would do who is mindful of the habits and customs in its field, and standards of justice and fair dealing. This includes whether the County conducted a fair investigation, treated the Grievant fairly in the process, and administered a fair result. The burden is on the County to show that it had just cause for the discipline.

The BAC noted "[t]he County took its responsibility to conduct a fair investigation very seriously." AFSCME asked the County Commissioners to investigate the allegations against Gardner and the County Commissioners hired a neutral third-party investigator, Rebekah Smith, Esq.

Although the BAC determined that Gardner did not have a right to confront witnesses, Gardner knew of the accusations and the evidence provided by the accusers. Gardner also had the opportunity to give Ms. Smith names of individuals who would provide information favorable to him and to provide evidence in his defense.

The BAC concluded that the County had just cause for discipline. The BAC noted:

Mr. Gardner had a history of ignoring these rules by making rude, degrading, sarcastic and unprofessional comments, both directly to

people and over the radio, where coworkers and inmates could hear these comments. The great majority of people interviewed by Ms. Smith reported that the environment on Mr. Gardner's shift was hostile. Even the witnesses who did not perceive hostility themselves knew that others on the shift felt that way. As noted above, Ms. Smith found the complainants' testimony to be credible based upon their demeanor and the corroborating statements of other witnesses. The weight of the evidence Ms. Smith fairly and thoroughly gathered indicated that Mr. Gardner, both in person and over the radio, persistently abused his power as a supervisor by relying upon belittling, humiliating and negative treatment, often directed at female subordinates, but also towards individuals he perceived as weak.

Gardner provided testimony to support his argument that he was doing his job to hold his subordinates accountable for their duties. Nevertheless, the BAC concluded the County had just cause to discipline Gardner:

> We conclude that there was ample evidence in the record that Mr. Gardner violated both the Code of Conduct and Appearance and Article 1 of the Agreement creating a hostile work environment by acting in a manner that was intimidating, belittling, humiliating and negative, primarily towards female employees and others he perceived as weak. Therefore the County had just cause to discipline him.

The BAC also evaluated whether the discipline of demotion was appropriate under the circumstances. The BAC explained:

> The evidence supports the Sheriff's conclusion that Mr. Gardner's conduct had a significant negative impact on most of his subordinates, that it impaired efficient functioning of the jail staff, and exposed the County to potential legal claims. The Sheriff had verbally counseled Mr. Gardner about his conduct, and it was the subject of some of his evaluations. As the Sheriff demonstrated, Mr. Gardner's behavior would improve temporarily after he was counseled, but he would always return to his style of humiliation, sarcasm and belittling.

. . . .

When a supervisor persistently abuses his power, the employer can take away his stripes. Although Mr. Gardner could be a very competent CO, he did not do well in apposition of authority, and it was appropriate that the Sheriff removed him from such a position. The Sheriff took into account Mr. Gardner's lengthy service and experience on the job in choosing to demote him. Because there was evidence that Mr. Gardner was a good worker in other ways, it made sense to give him a chance to continue to be employed as a CO, but not in a capacity that would allow him to persist in treating other COs in a manner that violated the Agreement and Code of Conduct.

After comparing Gardner's discipline with the discipline given to other employees, the BAC determined that the other situations were not comparable. Thus, the BAC found the County had just cause to demote Gardner.

Next, the BAC evaluated whether the County violated the BAC contract by temporarily restricting Gardner from bidding on open shift assignments. As part of this, the BAC determined:

There was evidence in the record that the Sheriff and Jail Administrator both have considerably more discretion in meting out discipline than the five options listed in the Agreement. Examples of discipline introduced by the Union included things such as a corrective probation status in connection with an unpaid suspension from work. We believe that the temporary restriction on Mr. Gardener's ability to bid on these assignments was an important aspect of implementing the demotion. Given that Mr. Gardner was demoted essentially for abusing his power, allowing him to work with his former subordinates immediately afterwards would have likely created a difficult situation affecting the jail's ability to function effectively. This restriction provided a sensible cooling off period that worked to protect both Mr. Gardner and the other employees. There was no point in demoting him if he could return to his former position. Furthermore, this was a temporary measure that has since expired. It did not violate the Agreement.

Maine's Uniform Arbitration Act under 14 M.R.S. §§ 5927-5949 applies to agreements made subsequent to October 7, 1967. 14 M.R.S. § 5946. The Parties sometimes refer to the statutory arbitration provisions in 26 M.R.S. §§ 951-960, but those sections "shall not apply to any provision or agreement relative to

arbitration contained in a collective bargaining contract entered into prior to Augusta 28, 1957, or after October 6, 1967, or to any agreement to submit to arbitration an existing controversy entered into prior to Augusta 28, 1957, or after October 6, 1967." 26 M.R.S. § 960. Here, the Parties entered the collective bargaining agreement on October 19, 2009, so the court refers to Maine's Uniform Arbitration Act under 14 M.R.S. §§ 5927-5949.

Upon application of a party, the court shall vacate an award where, among other things, "the arbitrators exceeded their power . . . ." 14 M.R.S. § 5938(1)(C). "The burden of demonstrating that an arbitrator exceeded his or her authority lies with the party seeking to vacate the award." *Stanley*, 2015 Me. LEXIS 21, ¶ 23 (*quoting Randall v. Conley*, 2010 ME 68, ¶ 21, 2 A.3d 328). Findings are not reviewable under this standard of review. *Stanley*, 2015 Me. LEXIS 21, ¶ 24.

"In reviewing an arbitrator's award directly, the primary issue is whether the award was within the arbitrator's authority." *Stanley v. Liberty*, 2015 Me. LEXIS 21, ¶ 23, 111 A.3d 663, 669 (Me. 2015). "When an arbitrator stays within the scope of [his or her] authority, the award will not be vacated even when there is an error of law or fact." *Stanley*, 2015 Me. LEXIS 21, ¶ 23 (*quoting Commercial Union Ins. Co. v. Me. Emp'rs Mut. Ins. Co.*, 2002 ME 56, ¶ 8, 794 A.2d 77; *see also Leete & Lemieux*, 2012 ME 71, ¶ 12, 53 A.3d 1106)). The party seeking to vacate the award must show a manifest disregard of the contract:

> We have previously articulated a narrow standard for determining whether an arbitrator exceeded his authority under 14 M.R.S.A. § 5938(1)(C). We must uphold the Superior Court unless it was compelled to vacate the award. *Concord Gen. Mut. Ins. v. Northern Assurance Co.*, 603 A.2d 470 (Me. Feb. 13, 1992). A court may not substitute its judgment for that of the arbitrator. It is the arbitrator's construction of a contract that is bargained for, and only when there is a manifest disregard of the contract or the award contravenes public policy will we disturb the award. *See Bureau of Me. State Police v. Pratt*, 568 A.2d 501, 505 (Me. 1989). The mere fact that an arbitrator commits an error of law does not mean that he has exceeded his authority. *See In re Appeal of Upper Providence Police Delaware Cty Lodge #27 Fraternal Order of Police*, 514 Pa. 501, 526 A.2d 315, 322 (Pa. 1987); *School Comm. of Waltham v. Waltham Educators Ass'n*, 398 Mass. 703, 706, 500 N.E.2d 1312, 1314 (1986); *Burd, Inc. v. Stoneville Furniture Co.*, 134 Ill. App. 3d 149, 479 N.E.2d 962, 965, 88 Ill. Dec. 942 (1985).

*DOT v. Me. State Emps. Assn., SEIU Local 1989*, 606 A.2d 775, 777 (Me. 1992). Specifically, the Law Court explained when an arbitrator exceeds his or her authority:

When an arbitrator's decision rests on interpretation of a contract under which

the parties' disputes arose, an arbitrator exceeds his or her authority pursuant to 14 M.R.S. § 5938(1)(C) only if the arbitrator goes outside the agreement and "[only] if all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of contract." *Granger N., Inc., v. Cianchette*, 572 A.2d 136, 139 (Me. 1990) (alteration in original). We will uphold an award "if *any* rational construction of the agreement *could* support [it]." *Dep't of Corr. v. Am. Fed'n of State, Cnty. & Mun. Emps., Council*, 93, 2000 ME 51, ¶ 9, 747 A.2d 592.

*Stanley*, 2015 Me. LEXIS 21, ¶ 26 (citations omitted). And overall, a plaintiff's argument that the arbitrator exceeded his authority is a difficult claim:

[The Law Court has] observed that "for arbitrators to make an error of law is not to exceed their powers," and "[a] reviewing court is not empowered to overturn an arbitration award merely because it believes that sound legal principles were not applied." *Anderson v. Willey*, 514 A.2d 807, 810 (Me. 1986). "In bargaining for an arbitrator's decision, the parties bargain for the arbitrator's interpretation of the law as well." *Id.*

*Stanley*, 2015 Me. LEXIS 21, ¶25 (citations omitted).

AFSCME sought a review of the arbitration decision because the arbitrators did not act "'within the scope of the authority delegated' to them and act 'fairly and reasonably to the end that labor peace between the public employer and its employees will be stabilized and promoted.'" AFSCME divided its argument into six Counts:

**Count I**: the BAC exceeded its powers by relying on "counseling" to support just cause.

**Count II:** The BAC exceeded its power by considering time barred conduct as support for the demotion.

**Count III:** The BAC exceeded its power by failing to require progressive discipline to justify the demotion.

**Count IV:** the BAC exceeded its powers in denying Gardner his industrial due process right to confront his accusers.

**Count V:** Just cause right to confront as to available evidence.

**Count VI:** the BAC exceeded its powers in ruling that it was entitled to supplement the disciplinary scheme in the CBA.

**I.** The BAC considered the verbal counseling in the context of Gardner's work evaluations: the verbal counselings were reflected in Gardner's work evaluations. The plain language of the CBA does not prohibit the Sheriff or the BAC to consider work evaluations in deciding Gardner's demotion.

Moreover, this Court finds that the BAC may consider verbal counselings under the CBA. Generally under the CBA, "[d[iscipline shall only be administered for just cause." Counselings may be a factor in determining discipline; the relevant portion of the CBA stated:

> Nothing in this contract shall prevent the Sheriff and/or his designee(s) from calling an employee in for counseling purposes as deemed necessary by the Sheriff and/or his designee(s). Such counseling shall not be considered disciplinary action, but written documentation of the counseling session may be placed in the employee's file.

> Documentation of counseling and/or discipline shall be maintained in the employee's personnel file. Provided no further counseling or discipline has been taken regarding the employee, previous counseling or discipline may be a factor in determining discipline and may only be used for the purpose of discipline and may only be used for the purpose of discipline within the following time frames: . . . .

Thus, previous counselings may be a factor, but the CBA does not explicitly state that the counseling must be in writing. This interpretation allows the BAC to consider verbal counselings.

It may be argued that this Court must look at "counseling" in the context of the two paragraphs. In the first paragraph, the CBA described that written documentation of counseling may be put in an employee's file. Then, in the second paragraph, the CBA explained that any documentation of counseling shall be maintained in the employee's file. The CBA is describing written documentation. Consequently, the CBA's use of "previous counseling" in the second paragraph must mean written, documented counselings.

Assuming the BAC's reference to verbal counseling violated the CBA, this was a minor factor in comparison to the rest of the BAC's analysis. Even if this Court considered this reference an error of law, the BAC did not exceed its authority because the BAC had other evidence to conclude the County had just cause. Simply put, the BAC's references to the verbal counseling do not create a manifest disregard of the contract. *DOT v. Me. State Emps. Assn., SEIU Local 1989*, 606 A.2d 775, 777 (Me. 1992).

**II.** The CBA allows the Sheriff to consider previous counseling and discipline as a factor in determining the current discipline as long as the Sheriff considers the counseling within one year. Here, Gardner's counselings occurred more than a year before this action began. And the Sheriff explicitly did not consider Gardner's counseling and/or disciplinary action prior to 2009, but considered Gardner's underlying conduct for that counseling and/or disciplinary action. The BAC implicitly relied on Gardner's pre-2009 conduct as well. This interpretation is consistent with the CBA as explained above.

In addition to relying on the underlying conduct, the BAC went beyond the Sheriff's reasoning and also referenced Gardner's counseling for the pre-2009 conduct and the counseling's effect on Gardner:

> The Sheriff had verbally counseled Mr. Gardner about his conduct, and it was the subject of some of his evaluations. As the Sheriff demonstrated, Mr. Gardner's behavior would improve temporarily after he was counseled, but he would always return to his style of humiliation, sarcasm and belittling.

. . . . .

This was a more isolated situation that could possibly be corrected in this manner, in contrast to Mr. Gardner's inability to change his inappropriate behavior permanently despite previous counselings and evaluations.

**III.** Progressive discipline is not required under the CBA. As explained above, "[d[iscipline shall only be administered for just cause." Although the Discipline and Discharge provision identifies what may be considered progressive discipline, the plain language of the CBA does not require it.

AFSCME argued the grievance procedure would be meaningless if this Court did not find progressive discipline was required. But the grievance procedure is initiated by the employee to allege that the employer violated the Agreement. Thus, Gardner was required to challenge any discipline he believed violated the agreement.

Moreover, AFSCME cited two cases in support of its argument: *Galouch v. State*, 2014 Me. Super. LEXIS 159 (July 22, 2014) and *AFSCME, Council 93 v. City of Portland*, 675 A.2d 100 (Me. 1996). But those cases do not support AFSCME's argument. AFSCME relied on *Galouch* to argue that courts have recognized proper just cause determinations can be based on the proper application of progressive discipline. But *Galouch* does not stand for that proposition, instead the *Galouch* court was explaining facts of the case. *Galouch*, 2014 Me. Super. LEXIS 159, *11. AFSCME relied on *AFSCME, Council 93 v. City of Portland* to explain the meaning of progressive discipline. That is good to know, but does not help determine this case because, in *AFSCME, Council 93 v. City of Portland*, the Agreement referred to a regulation that required progressive discipline. *AFSCME, Council 93 v. City of Portland*, 675 A.2d at 102-03. Moreover, these two cases do not control because the CBA in this case does not required progressive discipline, instead requires just cause.

**IV.** AFSCME argued the BAC exceeded its powers by denying Gardner his due process right to confront his accusers. AFSCME identified three particular ways: (1) the investigator failed to provide Gardner with her notes from the investigation; the BAC should have allowed Gardner to confront the witnesses against him; and Gardner had an inherent right to a decision where each finding is supported by an eyewitness who testifies under oath at the arbitration hearing.

Gardner's arguments essentially asks whether the BAC can rely on hearsay evidence for its decision. Under Maine's Uniform Arbitration Act, "[t]he parties are entitled to . . . cross-examine witnesses appearing at the hearing." 14 M.R.S. § 5931(2). The BAC's Rules also give parties rights to cross-examine witnesses: "Any party to the hearing shall have the right to be represented by counsel or by other representative, at the party's expense, to examine and cross-examine witnesses, and to offer documentary and other evidence." BAC's Rules, Chapter 1, § 16 (http://www.state.me.us/mlrb/bac_rules/index.htm) (notably, the BAC's Rules are based in part on 26 M.R.S.A. §931.). Although the statute allows for cross-examination, the cross-examination is of witnesses appearing at the hearing; the BAC's Rules are consistent with the statute.

To resolve this issue, this Court should look broadly at what evidence is allowed at the hearing. "The parties are entitled to be heard, to present evidence material to the controversy and to cross-examine witnesses appearing at the hearing." 14 M.R.S. § 5931(2). And the BAC's Rules require:

> **§ 13. Rules Regarding Evidence.** The strict rules of evidence observed by courts do not apply in matters before the Board. The following rules regarding evidence apply:
>
> 1. Evidence. The Board shall admit evidence if it is the kind upon which reasonable persons are accustomed to rely in the conduct of serious affairs. Irrelevant or unduly repetitive evidence may be excluded.
>
> 2. Rules of Privilege. The Board shall observe the rules of privilege recognized by law.
>
> 3. Written Evidence; Exception. No sworn written evidence shall be admitted unless the author is available for cross-examination or subject to subpoena, except for good cause shown.

BAC's Rules, Chapter 1, § 13 (http://www.state.me.us/mlrb/bac_rules/index.htm) (notably, the BAC's Rules are based in part on 26 M.R.S.A. §931.). Based on the statute and BAC's Rules, hearsay is not explicitly prohibited.

Moreover, although Maine courts have not evaluated whether hearsay is allowed in an arbitration hearing, district courts in the first circuit have found that "[i]n the absence of any controlling principles established under the parties' agreement, it was within the scope of the arbitrator's authority to determine [the weight of hearsay]." *Johnson Controls, Inc. v. Int'l Union, of Operating Eng'rs, Local 877*, No. 03-10421-GAO, 2004 U.S. Dist. LEXIS 21447, at *6 (D. Mass.

Sep. 30, 2004); *see also Unión De Tronquistas De P.R., Local 901 v. Crowley Liner Servs.*, 107 F. Supp. 3d 213, 216 (D.P.R. 2015)(finding an arbitration award based on hearsay did not violate due process because the statutory grounds to overturn an arbitration award did not include due process violations of hearsay).

All fair and reasonable minds would agree that BAC's interpretation that hearsay was permitted at the hearing was possible under a fair interpretation of the contract, statute, and case law.

**V.** AFSCME argued that the County failed to disclose a witness statement in a timely manner. Gardner had a *Loudermill*-type hearing before his demotion, but the County did not provide Pena's statement to Gardner. (citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985).) The County finally disclosed Pena's statement to Gardner in the days prior to the arbitration hearing.

The court finds that AFSCME had the witness statement two days before the first arbitration and about a month before the second hearing. AFSCME could have requested a subpoena for Pena to testify before the arbitrators at the second hearing.

**VI.** AFSCME argued the BAC exceed its powers by improperly ruling that "Gardner's demotion could be supplemented by the additional penalty of not being able to 'bid on open shift assignments' form his new position."

The BAC affirmed that aspect of the arbitration award:

We believe that he temporary restriction on Mr. Gardner's ability to bid on these assignments was an important aspect of implementing the demotion. Given that Mr. Gardner was demoted essentially for abusing his power, allowing him to work with his former subordinates immediately afterwards would have likely created a difficult situation affecting the jail's ability to function effectively. This restriction provided a sensible cooling off period that worked to protect both Mr. Gardner and the other employees. There was no point in demoting him if he could return to his former position. Furthermore, this was a temporary measure that has since expired.

The Court finds that the BAC did not exceed its powers because the restriction was necessary to effectuate the purpose of the demotion. As the BAC explained, Gardner could have defeated the purpose of the demotion by bidding to work with his former subordinates. Although the CBA lists only five disciplinary

action or measures, the BAC determined that the temporary restriction was an important aspect of implementing the demotion. As the County argued before the BAC, the temporary restriction was an integral part of the demotion. The BAC needed this temporary restriction to effectuate the demotion.

For the reasons stated herein, the entry will be:

> Plaintiff's motion to vacate the award of the Board of Arbitration and Conciliation of January 23, 2015 is DENIED.

Clerk may docket by reference.

DATED: AUGUST 16, 2016

Date entered on Civil Docket: 8/25/16

Donald H. Marden
Active Retired Justice
Superior Court